The next case, number 25-1578, Ed Friedman v. Central Maine Power Company. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Yes. May it please the court, I'm William Most for plaintiff appellant Ed Friedman. If I may, I'd like to reserve two minutes for rebuttal. Mr. Friedman has an incurable blood cancer called lymphoplasmicidic lymphoma. Two of his doctors recommended he avoid unnecessary radiation exposure because of his cancer. He had asked the Central Maine Power Company to not have a radiation emitting smart meter in his home. And the power company agreed on the condition that he pays a perpetual monthly escalating fee, which they would not waive despite his cancer. So he filed suit under the ADAAA, the Rehabilitation Act, and the Fair Housing Act for denying the accommodation request to waive the fee. The trial court erred in dismissing this case at summary judgment for three primary reasons. Number one, regarding the unlawful surcharge argument, which covers charges that cover the cost of an accommodation, the trial court applied a per se rule that this circuit has never adopted, saying that if the fee is charged to everyone, then it definitely cannot be an unlawful surcharge. Second, the trial court granted summary judgment applying an almost certainty of harm standard that this court has not adopted, the Supreme Court has not adopted, and even conflicted with the trial court's ruling at the motion to dismiss phase. And then third, sort of applying that certainty of harm standard improperly, the trial court found that the testimony from plaintiff's experts and treating physicians was insufficient to prove what was necessary to be proven and granted summary judgment. So taking first the surcharge question, which is... Could you switch to the second one first? Sure. I take it your view is not that a speculative risk of harm is enough? Correct, Your Honor. You think that's not enough? Yes, that would not be enough. Okay, so why was more than that shown here? Because the magistrate judge said that all there was was a speculative risk of harm. Sure. So just starting first with the standards, because we agree with the court that speculation would not be enough. What we think was properly stated was what the trial court said at the motion to dismiss phase, which is appendix at 39, that the plaintiff to prevail in this case would have to show that the impacts from the smart meter actually risked worsening his symptoms or progression. Right, and then the magistrate judge says that all there was in the record of that was speculative. And it was a full judge. It was not a magistrate judge. I thought Judge Niffesen was covering the entire case.  That's right. But that was error because what the plaintiff had was he had experts who had survived Dalbert challenges, two of them, who would be able to testify about the impacts of. . . But they never testified about what the likelihood of the risk was at all. That's true. It is not possible to ascertain a precise. . . Well, then it would be speculative whether it would be more than a speculative risk necessarily, right? Just because you can't put a number on something, that doesn't mean it's speculation. That's true. But if you can't put any number on it, then it would be speculative what number you would put on it. It would be speculative what number you would put on it. If you say I cannot put any number on it, I could only speculate what number you would put on it, right? My point is that just because you can't precisely ascertain a number does not mean it's speculative. Fine. What number would the experts have put on it? I don't know that they came to a number. Could they come up with any number? I am not sure if they could come up with a number. They could say qualitatively that the effects of this kind of radiation have certain kinds of impacts on people with blood cancers like Mr. Friedman's, right? It is not possible to know with certainty what would happen to him unless we irradiated him directly. And is it possible to know that it's more than a speculative risk? Yes. Did they say that? Yes. Yes. For example, Dr. Carpenter, this is appendix 47, talked about that elevated exposure to electromagnetic frequency shortens the survival of people with similar cancers. That's at page 47 of the appendix. Both Carpenter and Heroux talked about the effects of oxidative stress on people with blood cancers like this and oxidative stress being generated by exposure to low-level electromagnetic frequency. So they did not say there's a 60% chance or a 40% chance that Mr. Friedman would be harmed by this. But there's no case law that says you have to put a number on it for it to be more than speculation. All the time people say... So when they said an elevated amount, did they testify that the elevated amount they were talking about is equivalent to the amount that would be caused by this meter? Yes. They were talking about it in the context of they looked at the specs of the meter and looked at and were able to testify broadly what their interpretation would be about the risks from that to someone with a cancer like Mr. Friedman's. Mr. Friedman has a very rare cancer. It has an incidence rate of three to six people per year out of a million. And so there's not a lot of evidence about this kind of cancer particularly. So we have to infer somewhat from lymphomas and leukemias. Now these are the experts that were struck for not being disclosed or these were the experts that were not struck? No expert was struck entirely. One was withdrawn by the plaintiff and two, their testimony was cabined. But they still survived out there and were allowed to proceed. But there are other experts who are... Am I right that there were other experts who are... You're contesting the way the district... Yeah. Are those experts or different experts? Those are the treating physicians. Right. So Mr. Friedman had... Put aside the treating physicians, you say you have two experts who everybody agrees could have given testimony that the amount of elevated radio frequencies that would have come from this meter would have appreciably caused a risk of shortened survival to a person with this type of blood cancer. With cancers like this, yes. And those are Dr. David Carpenter and Dr. Paul Heroux who survived the Dalbert challenges by defendant. When you say everyone agrees, I don't think the defendant would agree, but the court certainly ruled that. And so you had Mr. Friedman's treating physicians on one hand who could talk about what is his cancer, what's his prognosis, what's his treatment, and then you had the experts who survived Dalbert, Heroux and Carpenter who could talk about the effects of low-level electromagnetic radiation on people with cancers like this. And that's why we think it was error to conclude that no reasonable fact-finder could draw any sort of linkage between these two, given the expert testimony. And I think that flows from the trial court's error in requiring the sort of certainty of harm standard. So at addendum 37, the court required the plaintiff to show that this would actually harm him, not would actually risk harming him the way it was framed at the motion to dismiss standard. And I think it's worth thinking about how we think about disability discrimination claims generally, which is when someone has a disability, we don't ask them to prove that they would definitely be harmed by the absence of accommodation. If someone has a balance issue and asks for something to grab onto in their workspace, we don't require them to prove, I would definitely fall if not for this bar. What we ask them to prove is they have an increased risk of falling due to their disability. And so we think that the requirement of requiring him to prove actual certain harm as opposed to risk is just not how the case law treats disability discrimination claims generally. Counsel, can I just ask you about that? Your client's health condition is obviously extremely sad and serious. But I think I was just reading the district court's decision differently than you. So at page 32 of your addendum, I think what the district court was really saying, as I read it, was that a fact finder had to be able to find more than a mere possibility of harm based on what the expert said. And according to the district court, who reviewed everything very carefully, in his view, the experts just didn't provide any information that would allow a reasonable fact finder to conclude that there was more than a mere possibility of harm because they couldn't quantify it. They couldn't really explain how it would impact him in a meaningful way. And that was the heart of what the district court said. So I don't think the district court was asking for certainty. It just said there has to be more than a mere possibility. Why am I wrong in your view in how I'm reading the district court's opinion? Yes. So at one point, there's a reference to more than a mere possibility, which I think is inarguably correct. It is later when the court talks about, let's see, on page 37 of the addendum, that he must incur to avoid the risk that exposure to RF radiation would adversely impact his condition. So there, there's a shift to we're not just talking about a possibility. Let's assume he did it right and there wasn't this legal error and that the standard he applied is you had to show more than a mere possibility. Yes. I thought your contention to me was you showed that, so it was just wrong to say you hadn't showed that. I think the trial court was both wrong to say that you have to show this certainty and also wrong to say that there was not more than a mere possibility. Okay. On that second point. Yes. You're relying on the Heroux testimony for the proposition that you had Evans in the record to show that there was more than a mere possibility? I think it is. Both of them say it, both Heroux and Carpenter. I think Carpenter more clearly says it in his expert report. If you look to it, that's appendix at 47. But both experts opine along those lines. Thank you. Thank you. Thank you. At this time, would counsel for the appellee please introduce himself on the record to begin? Thank you. May it please the Court, Christopher Tainter for the appellee, Central Maine Power Company. I'd first like to just clarify exactly what happened with the expert witnesses. The plaintiff originally designated three expert witnesses, actually four, but three on the health effects of radiofrequency radiation. We took the depositions of all three of those experts. We then filed Daubert motions to exclude them. The district court, which then was Judge Levy, ruled that Dr. Carpenter and Dr. Heroux could testify on the issue of general causation, on the question of whether exposure to radiofrequency energy in the dose emitted by a CMP smart meter could have a negative effect on the health of some human beings. The third health expert, Kent Chamberlain, was withdrawn by the plaintiff after the Daubert motion was filed. So we filed our motion for summary judgment with the understanding and expectation that there would be no testimony, because none was admissible, on the question of the effect that exposure to radiofrequency energy would have on Mr. Friedman individually. In response to that motion for summary judgment, the plaintiff submitted a declaration from his primary care physician, Dr. Stephen Goldbass, and also alluded to some testimony by his oncologist, Dr. David Benton. And we argued that the court shouldn't consider that testimony because Dr. Benton and Dr. Goldbass hadn't been designated as expert witnesses, among other things, and also because Dr. Goldbass's declaration was completely conclusory and Dr. Benton's testimony really sort of changed the, or at least as it was interpreted by the plaintiff, sort of changed the focus of the plaintiff's theory. Because the original theory in the case, and the one alleged in the complaint, was and is that exposure to RF energy promotes Mr. Friedman's cancer, makes his symptoms worse, possibly shortens his life expectancy. What Dr. Benton said, again, as construed by the plaintiff, and I disagree with the way they interpreted it, was that, well, maybe not, but he's so stressed by the concept of having a smart meter in his house that that might somehow interfere with his management of his disease. Put this aside for a second. Just help me with this. You don't dispute that Heroux and Carpenter could testify, generally, to the proposition that elevated RF energy shortens the survival of persons with cancer, or do you? And did they testify to that? Well, I think the only time Carpenter really testified, well, let me say this. I think Carpenter does rely on some studies that suggest that that may be true of some people. There are some studies which may support that for some people who have blood cancers. He was prohibited or barred, as a result of our motion, from testifying. I think he suggested it might shorten Mr. Friedman's life expectancy by as little as a few seconds. And he was prohibited from testifying even about that because he wasn't familiar with Mr. Friedman's records. Dr. Heroux... So, Joe, just on Carpenter, so Carpenter testified some people with blood cancer, but not all people with blood cancer might have shortened survival? Well, I think, yeah, I think that's probably right, just because the studies are what they are, and they just, you know, there may be in some isolated... And the shortening that he was describing, did he quantify what the shortening was or no, in what he was permitted to testify about? No. And did he, when he was talking about the shortening resulting from the RF energy, was he talking about elevated amounts that were equivalent to the amounts on the meter? No. No. No, because there were no studies of people's exposure to smart meters and how that would affect their health. And Heroux, same? Same, right. And Heroux, it's interesting, in the plaintiff's brief... So I take it your position then is even accounting for the Heroux and Carpenter testimony, the most you could say about it is that there's a possibility that this meter would cause some harm to this person. Right. And therefore you say that Judge Nevison got it right, but it's because if everybody agrees a mere possibility that it might happen is not enough, that's all that the evidence could possibly show. That's right, Your Honor. And, you know, I do think it's important. There's a suggestion in the plaintiff's or the appellant's brief, and I don't recall at this point whether it was in the principal brief or in the reply brief, that Dr. Heroux made the statement, I think it was in the reply brief, that Dr. Heroux's testimony was sufficient to establish standing because he testified that it is a certainty that exposure to radio frequency energy will have an adverse effect on cancers like Mr. Friedman's. That is not what Dr. Heroux said. If you look at the testimony to which the appellant cites, what he said was that it is a certainty that exposure to RF will generate reactive oxygen species in human beings and that reactive oxygen species can have the effect of promoting cancer, but there is no quantification of the relationship between heightened ROS and increased cancer or worse symptoms or shortened life expectancy or anything of the kind. So, you know, we believe, first of all, I think that the key point here is that, really, the decision on the Daubert motions was sort of the beginning and end of the case as far as we're concerned. At that point, there's no admissible expert testimony that RF emissions... That part of it, when you say that, I was with you until you started saying that. The thing that worries me is, in fact, if you're going where I think you're going, that would suggest that even if the general causation testimony was quite favorable to plaintiff in the sense that most people suffering from these cancers subjected to these levels of RF energy will show reduced life expectancy. It's not evident to me that then additional testimony saying this person has that type of cancer would foreclose a triable issue of fact about whether there is a risk to this person from those higher levels of energy. Here, it sounds to me like you're saying we don't get to that question because the general causation evidence itself isn't even of that strong a kind. It's just of the kind that persons with these types of cancers may have these effects from higher energy which may then cause, we don't know how often or in how many, adverse effects for them with respect to their cancers, which when you take that body of general causation evidence, I can see how the district court would then be of the view, well, it's just a mere possibility as to how it will affect this particular person. I agree with that. I think even the general causation testimony is bereft of any sort of specificity. There's no quantification of what the risk is. It's just this can cause problems, sort of indeterminate problems for some indeterminate number of people with these kinds of cancers. I think, though, we would also need to get, there's another point that hasn't really been developed, I guess, because we didn't get to it, and that is the suggestion that all blood cancers are the same and that all people with all different kinds of blood cancers would have the same response to exposure to RF. And there's no evidence of that, and neither Dr. Carpenter nor Dr. Heroux is a clinician. Dr. Heroux is a scientist. He doesn't treat patients at all. Dr. Carpenter, I don't recall whether he treats patients, but he certainly, I don't even know that he reviewed Mr. Friedman's medical records, but he's basically a public health expert. And you would need to have someone who would be able to say that this exceedingly rare cancer that Mr. Friedman has is in fact comparable to the kinds of blood cancers that have been shown to be affected in some negative way by excessive exposure to RF. And I would also disagree, and I'll defer to the record because my memory on this may not be accurate, but I don't believe that either Dr. Carpenter or Dr. Heroux knew what the dose was of RF that Mr. Friedman would receive from a smart meter. So I don't think it was accurate to say that he could testify about that. And if there are no further questions, I'll rest on our briefs and ask the Court to affirm. Thank you. Thank you.  At this time, would Counsel for the Appellant please reintroduce himself on the record to begin? Yes, William Most for Appellant. So the idea is that perhaps these experts were only talking possibilities, may have an effect, maybe, possibly. It's not what they said. At page 47 of the appendix, this is Dr. Carpenter's expert report. He writes, quote, there is clear evidence that elevated exposure to electromagnetic fields shortens survival of children diagnosed with leukemia, also a blood cancer. And later, quote, I conclude with a reasonable degree of medical certainty that if a smart meter were placed on Mr. Friedman's house, the elevated exposure coming from it would increase the risk his cancer would worsen, which in turn logically may exacerbate his symptoms affecting his quality of life and likely shortening it. But, Counsel, was that part of the testimony permitted? I thought that it was excluded to the extent that they wanted to testify about specific aspects. Yeah, that's right. I'm not sure he could say that second part at trial. We can't consider it either, unless we disagree with the ruling. But my understanding is he didn't actually appeal that part of the ruling, right? Right, but I think it shows that someone could look at testimony about the effects of radiation on people with blood cancers like this and then know that this is a person with a blood cancer like this. No, it just shows that an expert thought that, and a jury certainly could rely on that. But if it's not before the jury, then the jury wouldn't have any basis for relying on it because there's no expert saying it. Not the second part, but the first part about it. What's the first part? The first part is, quote, There is clear evidence that elevated exposure to electromagnetic fields shortens survival of children diagnosed with leukemia, also a blood cancer. That is allowed. Yeah. And then how does a jury have a non-speculative basis for concluding that means that a non-child would also suffer from it? Well, I think they could learn about the fact that Mr. Friedman has a blood cancer like this and then draw an inference between the two. And I think What non-speculative basis would a non-expert jury be able to deduce that the outcome for a child with leukemia will be the same as it would be for an adult with this blood cancer? In the same way as every other disability where, you know, if there's an expert testifying people with balance issues suffer these risks, there's these kind of problems with people with balance issues, and then this is a person with a balance issue, you can infer that they have similar risks. And I think requiring precise quantification, look, scientists don't talk about precise quantification unless there's a large body of evidence. And what that does is requiring quantification, like there's a 65% chance of this kind of impact, what that does is it would mean that people with rare disabilities would not be able to get accommodations because they can't quantify the number by which their risk is measured. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.